UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
SARAH GRACE MORALES

                    Plaintiff,

      -against-

CAROLYN W. COLVIN
Acting Commissioner, Social Security
Administration,

                 Defendant.
---------------------------------------------------------X
FEUERSTEIN, J.

**ORDER**
14-CV-4331 (SJF)

**FILED**
**CLERK**

3/24/2016 10:24 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

      Sarah Grace Morales ("Plaintiff") commenced this action seeking judicial review of the

final determination of the Commissioner of the Social Security Administration

("Commissioner") denying Plaintiff's application for disability benefits pursuant to

42 U.S.C. § 405(g). Plaintiff and the Commissioner have each moved for judgment upon the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following

reasons, the Commissioner's motion is granted, and Plaintiff's motion is denied.

## I.      BACKGROUND

### A.    Administrative Proceedings

      Plaintiff applied for disability insurance benefits on February 21, 2012, alleging a

disability beginning on November 4, 2009 (onset date). (*See* Transcript of Administrative

Record ("Tr.") (Dkt. 21) at 136–37). The application was denied on April 25, 2012. (*Id*. at 89–

96). Plaintiff requested a hearing and appeared with counsel before administrative law judge

April Wexler ("ALJ") on January 18, 2013. (*Id.* at 51–83). On February 7, 2013, the ALJ

determined that Plaintiff was not disabled. (*Id.* at 8–20). On May 29, 2014, the Appeals Council

denied Plaintiff's request for review. (*Id.* at 1–7). Plaintiff commenced this appeal, and on

February 3, 2015, the parties each moved for judgment on the pleadings. (*See* Pl's Mot. (Dkt. 17-18); Def's Mot. (Dkt. 19-20)).

### B.     Testimony

Plaintiff, born October 10, 1976, formerly worked as a certified nurse's aide, and provided home healthcare services to geriatric patients, which included cooking, light cleaning, mobility assistance, and general help. (Tr. 54–56). Her work was light-duty only, and she did not lift more than ten (10) pounds. (*Id.* at 67). She has not worked since August 2008, when she gave birth to her daughter. (*Id.* at 56).

In 1994, Plaintiff sustained compression fractures in her T3, T4, T7, T8, and T9 vertebrae during a car accident, which required her to wear a full body brace for six (6) to eight (8) months. (*Id.* at 57, 66). The injuries healed but "constantly hurt." (*Id.* at 66). In November 2009, in another car accident, Plaintiff injured her lower and upper back, neck, and shoulder. (*Id.* at 56–57). She had two (2) herniated discs in her lower back and three (3) bulging discs in her neck. (*Id.* at 57).

Pain shoots down Plaintiff's right leg, causing her to experience "a numb, burning" and "sharp" sensation. (*Id.* at 68). As a result of the pain, she can sit for fifteen (15) to twenty (20) minutes before she has to change positions. (*Id.*). Pain also radiates down Plaintiff's left arm to her forearm from her neck. (*Id.* at 70). Plaintiff is right-handed. (*Id.* at 71).

Physical therapy did not alleviate Plaintiff's pain, and she does not currently receive treatment for her injuries. (*Id.* at 58). She took prescription pain medication, but stopped in 2008 because she became addicted; she now takes ibuprofen. (*Id.* at 59).

Plaintiff's physician treats her for high blood pressure and diabetes, and she takes Metformin, which controls both conditions.  (*Id.* at 61–62).  At some point between August 2008, when she had her daughter, and November 2009, when she was in her second car accident, Plaintiff was hospitalized for high blood pressure.  (*Id.* at 56, 61).

On a typical morning, Plaintiff wakes up, prepares breakfast for her daughter, drives her daughter five (5) minutes to school, returns home, "tries to. . . straighten up a little," and then sits on the couch and rests.  (*Id.* at 62).  She can clean to a limited degree, and can wash dishes and sweep, but experiences shooting pain in her legs and back, which prevents her from standing for extended periods.  (*Id.*).  In the afternoon, Plaintiff drives to pick her daughter up from school.  (*Id.* at 63).  She then prepares a meal for her family and gives her daughter a bath before bed.  (*Id.*).  Plaintiff is able to run errands like going to the grocery store, bank, and pharmacy, sometimes with her husband, but is unable to lift heavy items.  (*Id.* at 64).  Plaintiff also testified that although she is her daughter's primary caregiver, her husband sometimes watches her, and her sister comes to her home to assist three (3) or four (4) mornings per week and stays for two (2) to three (3) hours on each occasion.  (*Id.* at 63–65).  Her recreational activities include going out for dinner and/or a movie with her husband and visiting with family and friends at her home.  (*Id.* at 64).

Plaintiff, who is five (5) feet, nine (9) inches tall, weighed approximately one hundred eighty (180) pounds at the time of her 1994 car accident, two hundred (200) pounds at the time of her 2009 car accident, and two hundred forty-two (242) pounds at the time of the hearing in January 2013.  (*Id.* at 68–69).

Plaintiff has asthma, and uses a pump two (2) to three (3) times per day and a nebulizer before bed to control it, but still has breathing difficulties. (*Id.* at 71). Plaintiff also has chronic bronchitis, which manifests itself two (2) to three (3) times per year, for two (2) to three (3) weeks on each occasion, and requires the use of steroids. (*Id.*). Plaintiff has polycystic ovarian disease, which causes cramps during menstruation. (*Id.* at 72).

Victor Alberigi, a vocational expert, testified that a hypothetical person of like age, education, and work history, who is limited to sedentary work, who can occasionally lift ten (10) pounds, sit for six (6) hours, and stand or walk for two (2) hours, could not perform Plaintiff's past work as a home healthcare provider. (*Id.* at 79). However, Mr. Alberigi testified that such a person could work as (i) an envelope addresser (Dictionary of Occupational Titles ("DOT") No. 209.587-010), of which there were one hundred thirty-eight thousand (138,000) positions nationally, and four thousand, one hundred (4,100) positions in the Nassau–Suffolk County area (*id.* at 79–80); (ii) a document preparer (DOT 249.587-018), which is classified as a sedentary, unskilled job, and of which there were more than three million, two hundred thousand (3,200,000) positions nationally, and thirty-one thousand (31,000) positions locally (*id.* at 80); or (iii) an assembler of nonprescription optical goods, such as sunglasses (DOT 713.687-018), which is classified as a sedentary, unskilled job, and of which there were two hundred eighty-five thousand (285,000) positions nationally, and three hundred seventy (370) jobs locally (*id.*). Mr. Alberigi testified that if that hypothetical person needed to stretch for five (5) minutes each hour, most employers would not accommodate them, but some may. (*Id.* at 80). There were likely no jobs available to someone with that residual functional capacity ("RFC"). (*Id.* at 80-81).

### C.    Medical Evidence

Following the November 4, 2009 car accident, Plaintiff went to Eastern Island Medical Care, P.C. ("Eastern Island"), where she was treated by Dr. Daniel C. Korman for trauma to her face, chest, back, and pelvis, on November 10, 2009.  (*Id.* at 248-52).  She reported dizziness, vertigo, lightheadedness, and confusion.  (*Id.* at 248).  She could walk a few blocks at a slow pace, and was unable to lift ten (10) pounds.  (*Id.*).  On a scale of one (1) to ten (10), she rated her neck pain as a five (5), her trapezius, shoulder, and mid-back pain a seven (7), and her lower back pain an eight (8).  (*Id.*).  She also reported weakness, a burning sensation, tingling, and radiating pain, similar to an electric shock.  (*Id.*).  According to Dr. Korman's report, Plaintiff, who weighed two hundred thirty-two (232) pounds as of this date, had a lifelong history of obesity.  (*Id.* at 249–50).

Plaintiff had decreased ranges of motion in her neck, left shoulder, and lumbar region, and decreased strength in several muscle groups.  (*Id.* at 250–51).  Ranges of motion in Plaintiff's neck were: flexion to thirty-five (35) degrees (normal is fifty (50)); extension to forty (40) degrees (normal is sixty (60)); right rotation to fifty (50) degrees (normal is eighty (80)); left rotation to fifty-five (55) degrees normal is eighty (80)); right lateral flexion to ten (10) degrees (normal is forty-five (45)); left lateral flexion to fifteen (15) degrees (normal is forty-five (45)).  (*Id*. at 250, 280).  Ranges of motion in Plaintiff's left shoulder were: flexion to one hundred sixty (160) degrees (normal is one hundred eighty (180)); extension to forty (40) degrees (normal is fifty (50)); abduction to one hundred fifty (150) degrees (normal is one hundred seventy (170)); adduction to forty (40) degrees (normal is forty (40)); external rotation to sixty (60) degrees (normal is sixty (60)); and internal rotation to eighty (80) degrees (normal is eighty (80)).  (*Id.*).

Ranges of motion in Plaintiff's lumbar region were: flexion to ninety (90) degrees (normal is ninety (90)); extension to ten (10) degrees (normal is twenty-five (25)); and left and right lateral bending to ten (10) degrees (normal is twenty-five (25)).  (*Id.*).  Muscle testing revealed that Plaintiff's strength was as follows: five-fifths (5/5) in the left deltoid, left triceps, and left biceps; four-fifths (4/5) in the right deltoid, right triceps, right biceps, left and right forearm, left and right hands, left quadriceps, left hamstrings, left calf muscles, and left hallucis longus; and three-fifths (3/5) in the right quadriceps, right hamstrings, right calf muscles, and right hallucis longus. (*Id.* at 251).

Dr. Korman ordered magnetic resonance imaging (MRI), ultrasound, electromyography (EMG) and nerve conduction velocity (NCV) testing, acupuncture, and physical therapy, including lumbar stabilization, neuromuscular reeducation, and stretching.  (*Id.* at 251–52).  He diagnosed cervical, thoracic, and lumbar nerve root injuries and muscle spasms, left shoulder derangement, contusion, rotator cuff impingement, and paresthesia.  (*Id.* at 253).

On November 18, 20, and 21, 2009, Plaintiff underwent a series of MRI scans of her left shoulder, and cervical, thoracic, and lumbar spine.  (*Id.* at 181–84).  The MRI of her left shoulder revealed "a small area demonstrating isointense signal … within the supraspinatus tendon on the T1 weighted oblique/coronal sequence," and "[m]inimal marginal osteophytes … involving the acromioclavicular joint."  (*Id.* at 181).  Dr. Stephen Hershowitz diagnosed distal supraspinatus tendinosis, and minimal acromioclavicular joint degenerative disease.  (*Id.*).  The MRI of Plaintiff's cervical spine showed desiccation of all the cervical and intervertebral discs, straightening associated with muscle spasm, and posterior disc-bulges at the C4/5 and C5/6 levels that impinged on the thecal sac.  (*Id.* at 182).  The spinal canal was within normal limits,

and there was no evidence of neural foraminal narrowing or stenosis, the signal intensity of the bone marrow was within normal limits, the vertebral heights were well-maintained, and the paravertebral soft-tissue appeared normal. (*Id.* at 182). The MRI of the thoracic spine revealed minimal scoliosis, and a small anterior fracture of the T7 vertebra, but no evidence of bone marrow edema. (*Id.* at 183). Dr. Hershowitz noted minimal desiccation of all the thoracic intervertebral discs, and posterior disc-bulges at the T7/8, T8/9, and T9/10 levels, which impinged on the thecal sac. (*Id.* at 183). The MRI of Plaintiff's lumbar spine showed minimal desiccation of the L1/2 through L4/5 discs, minimal bilateral facet hypertrophy at the L5/S1 level, but severe desiccation of the L5/S1 disc. (*Id.* at 184). Paravertebral soft tissues were normal, the lumbar lordotic nerve was well-maintained, the vertebral body heights were preserved, the bone marrow signal intensity was normal, there was no intra-dural lesion, the spinal canal was of normal caliber with no evidence of stenosis, and the cauda equine and conus medullaris were unremarkable. (*Id.*). Dr. Hershowitz's diagnostic impression was "minimal degenerative disease" with "no evidence of disc herniation." (*Id.*).

On December 9, 2009, Dr. Stephen R. Fromm, a neurosurgeon who is a member of the Diplomate American Board of Neurological Surgery, reviewed the MRIs of Plaintiff's lumbosacral, thoracic, and cervical spine. (*Id.* at 276-78). He stated that the disc-bulging in Plaintiff's C4/5 and C5/6 vertebrae and straightening of Plaintiff's cervical spine were "not unusual, but the rule," and that "[c]onservative care will be continued." (*Id.* at 278). He recommended "[c]onservative care" for the compression fracture and disc-bulges in the T7/8, T8/9, and T9/10 thoracic vertebrae. (*Id.* at 277). As for Plaintiff's lumbosacral MRI, he noted disc desiccation at L5/S1, but no herniated discs, and also recommended conservative care. (*Id.*

at 276).  Dr. Fromm's diagnostic impression was (i) "[s]upraspinatus tendinosis [and] possible impingement syndrome," (ii) "[d]isc displacement [in] C4-5 [and] C5-6," (iii) "[l]umbosacral sprain," (iv) "[e]vidence of old vertebral body compression with findings of T7-8 through T9-10 disc displacement," and (v) "extensive, widespread co-morbidity of peripheral polyneuropathy with sensory loss, constant pain, neuropathic and hyperpathic pain and weakness of muscles, especially in the lower extremities," which was "not causally related to the accident of 11/05/09" and "may have been present at the time of the accident to the thoracic spine in 1994..."  (*Id.* at 275).  Dr. Fromm recommended that Plaintiff continue physical therapy five (5) days a week, get a computer tomography (CT) scan of her brain, and return for follow-up visits.  (*Id.* at 275).

On December 14, 2009, Plaintiff returned to Dr. Korman, and reported no change in her symptoms.  (*Id.* at 242).  Dr. Korman's notes indicate that Plaintiff could not lift a laundry bag heavier than (8) to ten (10) pounds, could carry her twenty-seven (27)-pound toddler only "very briefly," could only walk two (2) blocks, and experienced "profound" weakness and fatigue, but apparently she could walk for approximately thirty (30) minutes each night.  (*Id.*).  Dr. Korman stated that Plaintiff needed to lose weight and change her lifestyle, but that Plaintiff was not "inclined to have these issues discussed" and got "upset when [the] topic [was] broached."  (*Id.*).  Plaintiff indicated that her neck pain was a six (6) on a scale of one (1) to ten (10), her mid-back pain was a five (5), and she reported "severe" lower back pain.  (*Id.*).  She weighed two hundred thirty-two (232) pounds.  (*Id.* at 243).  Dr. Korman indicated that Plaintiff suffered from myofascitis, neuritis, and decreased range of motion in her neck, shoulder, wrist, thorax, and lumbar.  (*Id.* at 244).

On December 15, 2009, Dr. Korman conducted a lower extremity EMG / NCV, at least one purpose of which was to "[r]ule out peripheral entrapment neuropathy and lumbar radiculopathy." (*Id.* at 287-89). She had perceptible weakness in her right quadriceps, right hamstrings, and right calf muscles, and moderate resistance on her left side and her right hallucis longus. (*Id.* at 287). As to her lumbar range of motion, Plaintiff had a zero percent (0%) deficit in flexion, a sixty percent (60%) deficit in extension, and a forty percent (40%) deficit in right and left lateral flexion. (*Id.* at 288). Plaintiff rated her pain as six (6) on a scale of one (1) to ten (10). (*Id.* at 289). The tests revealed that all of Plaintiff's "nerves were within normal limits," as were her F Wave latencies, and H reflexes. (*Id.* at 291). Her left tibial and peroneal F-waves differed from those of her right side. (*Id.*). Her muscles showed no sign of electrical instability, NCV findings were normal, and EMG revealed no radiculopathy in her muscles. (*Id.*).

On January 12, 2010, Plaintiff saw Dr. Alpesh Shah at Orlin & Cohen Orthopedic Associates, LLP ("Orlin & Cohen") in connection with her no-fault insurance claim. (*Id.* at 185-91). She rated her "level of pain" at seven (7) out of ten (10), both while active and at rest, and the "severity of pain" at nine (9) out of ten (10). (*Id.* at 186, 189). Plaintiff reported pain in her neck, mid-back, lower back, and left shoulder, numbness in her right leg and left arm, and headaches. (*Id.* at 189). The pain was exacerbated by activity and dampness, diminished by rest and massage, and caused "localized tingling, stiffness, headaches, weakness, aches, burning, numbness, and pins and needles." (*Id.*). Physical examination of Plaintiff's left shoulder revealed that flexion and abduction were each to one hundred forty (140) degrees, and internal and external rotation were each to sixty (60) degrees. (*Id.* at 190). Impingement signs were positive, and she had pain at the endpoint on all of her range of motion tests. (*Id.*). Examination

of her neck showed that forward flexion was to thirty (30) degrees, extension was to twenty (20) degrees, left and right lateral flexion were each to twenty (20) degrees, and left and right lateral rotation were each to sixty (60) degrees. (*Id.*). The examination revealed that Plaintiff had pain, muscle spasm, and diminished flexibility in her neck. (*Id.*). Examination of Plaintiff's back (including spine) also showed reduced flexibility, pain, and muscle spasm in her lumbar region, and she reported radicular symptoms. (*Id.*). Ranges of motion in Plaintiff's lumbar region were: forward flexion to sixty (60) degrees, extension to five (5) degrees, and left and right lateral bending and rotation to ten (10) degrees. (*Id.*). Dr. Shah diagnosed the following: shoulder pain; rotator cuff tendinitis; acute cervical sprain; cervical radiculopathy; thoracic spine pain; thoracic sprain; compression fracture of the thoracic vertebrae; lumbar pain; and lumbar sprain. (*Id.*). Dr. Shah's treatment plan consisted of physical therapy, cortisone injections, icing, and a home exercise program. (*Id.*).

On January 20, 2010, Plaintiff saw Dr. Fromm, and complained of pain in her neck, lower back, and shoulder. (*Id.* at 271-72). She did not mention severe headaches at that time. (*Id.* at 272). Examination of the cervical region of Plaintiff's spine revealed that flexion was to thirty (30) degrees, and extension and lateral bending were twenty (20) degrees, with "pain on palpation of the paravertebral muscles and loss of cervical lordosis," and "loss of sensation in the anterior, posterior and lateral cervical area." (*Id.* at 271). Examination of the lumbosacral region of Plaintiff's spine revealed that flexion was to fifteen (15) degrees, extension was to ten (10) degrees, and lateral bending was to five (5) degrees, "with paravertebral muscle spasm, lumbar lordosis" and "decreased sensation in the lumbar, thoracic interscapular and posterior cervical and head." (*Id.*). Dr. Fromm diagnosed: (i) "[s]upraspinatus tendinosis, impingement syndrome

[of the] left shoulder"; (ii) "[d]isc displacement [in the] C4-C5 [and] C5-C6 [vertebrae]"; (iii) "[l]umbosacral sprain"; and (iv) "[c]o-morbidity of peripheral polyneuropathy with sensory loss, constant pain, numbness and hyperpathic pain and weakness of the lower extremities." (*Id.* at 272). He recommended that Plaintiff "undergo a three-hour glucose tolerance test and that a glycolated hemoglobin be done" due to her family history of diabetes. (*Id.*).

On January 22, 2010, Plaintiff saw Dr. Arash D. Yadegar of Orlin & Cohen for consultation regarding her lower- and mid-back, neck, and buttock pain. (*Id.* at 196). She described numbness, tingling, headaches, muscle spasms, and diffuse shooting pain that she ranked a nine (9) out of ten (10) on the pain scale, regardless of whether she was engaged in activity or at rest. (*Id.*). Plaintiff weighed two hundred forty (240) pounds. (*Id.*) As to Plaintiff's neck, there was "tenderness to palpation of the paraspinal musculature of the cervical spine," "tenderness to palpation of the trapezius," "tenderness to palpation of the midline cervical spine," and diminished flexion, extension, lateral bending, and rotation. (*Id.* at 197).

On February 9, 2010, Plaintiff returned to Dr. Korman, and reported no change in her condition. (*Id.* at 236). Dr. Korman's report indicates that Plaintiff weighed two hundred thirty-two (232) pounds, and Dr. Korman described her as "morbidly obese." (*Id.* at 237). Plaintiff's physical examination revealed that, since her December 14, 2009 visit, her range of motion had decreased in her neck, thoracic spine, and left shoulder. (*Id.* at 238, 244). Dr. Korman referred her to a neurologist and an orthopedist, and prescribed more physical therapy. (*Id.* at 239–40).

On February 9, 2010, Plaintiff also returned to Dr. Shah, and reported that her shoulder pain had decreased by fifty percent (50%). (*Id.* at 199). Plaintiff rated her pain as a six (6) out of ten (10) while engaged in activity, and a four (4) out of ten (10) while at rest. (*Id.*). Dr. Shah's

report indicates that Plaintiff weighed two hundred forty (240) pounds, and that she smoked cigarettes. (*Id.* at 199–200). Examination of Plaintiff's left shoulder revealed that her forward flexion was to one hundred sixty (160) degrees, abduction was to one hundred fifty (150) degrees, external and internal rotation were to sixty (60) degrees, impingement signs were positive, cuff testing produced pain on abduction, and that Plaintiff experienced pain at the endpoint of all ranges of motion. (*Id.* at 200). Examination of Plaintiff's neck revealed that forward flexion was to thirty (30) degrees, extension was to twenty (20) degrees, left and right lateral flexion were to twenty (20) degrees, left and right lateral rotation were to sixty (60) degrees, and, more generally, "pain, muscle spasm, and diminished flexibility." (*Id.*). Examination of Plaintiff's back and spine revealed "pain, muscle spasm, and diminished flexibility" in the lumbar region, and "altered" sensation of the right lower extremity. (*Id.*). Dr. Shah's overall assessment was that Plaintiff suffered from acute cervical sprain, pain in the thoracic spine, sprain in the thoracic region, rotator cuff tendinitis, shoulder pain, lumbar pain, osteoarthritis of the lumbar spine, and cervical radiculopathy. (*Id.*).

On March 18, 2010, Plaintiff visited Eastern Island for a consultation with Dr. Korman, and reported that cortisone injections had provided "mild relief," slow progress in physical therapy, and limited capacity to perform household chores due to her inability to lift more than ten (10) pounds. (*Id.* at 230). Dr. Korman noted that Plaintiff could stand for five (5) to ten (10) minutes and sit for fifteen (15) to thirty (30) minutes. (*Id.*). Plaintiff reported that her neck pain was four (4) to five (5) on a scale of one (1) to ten (10), back pain was five (5) to six (6), and buttock pain was "mod[erate] [to] severe." (*Id.*). Dr. Korman's report lists Plaintiff as weighing two hundred twenty-three (223) pounds and, again, described her as "morbidly obese." (*Id.* at

231). Dr. Korman's general findings were that Plaintiff suffered from myofascitis, and neuritis. (*Id.* at 232). He also reported that Plaintiff had slightly improved range of motion in her left shoulder and lumbar region. (*Id.*). Dr. Korman prescribed continued physical therapy, and indicated that Plaintiff was partially disabled. (*Id.* at 234).

On March 31, 2010, Dr. Korman completed a report containing the results of a large extremity range of motion exam and an impairment summary. (*Id*. at 295-96). Examination of Plaintiff's left shoulder revealed that external and internal rotation ranges of motion were normal, and that flexion and extension were one percent (1%) below normal. (*Id*. at 295). Dr. Korman reported left upper extremity impairment of two percent (2%), right upper extremity impairment of one percent (1%), and "final whole person" impairment of two percent (2%). (*Id.* at 296).

On April 9, 2010, Plaintiff returned to Dr. Yadegar at Orlin & Cohen for consultation concerning "dull/aching, nagging, pinching, pressing, radiating, and shooting" pain in her lower back and buttocks. (*Id.* at 203). According to the report, Plaintiff told Dr. Yadegar that rest and massage alleviated the pain, but that "standing, bending forward, extending back, lifting, exercise, and stairs" exacerbated it. (*Id.*). Plaintiff also reported that she suffered from headaches. (*Id.*).

On April 22, 2010, Plaintiff went to Eastern Island for an appointment with Dr. Korman. (*Id.* at 224-28). Treatment notes from this appointment indicate that Plaintiff performed daily chores / tasks slowly and with difficulty. (*Id.* at 224). Dr. Korman noted that he "encouraged [Plaintiff] to seek non-exertional type work." (*Id.*). Lumbar ranges of motion were as follows: flexion to ninety (90) degrees; extension to fifteen (15) degrees; and lateral bending to twenty

(20) degrees. (*Id.* at 226). Plaintiff's left shoulder ranges of motion were as follows: flexion to one hundred eighty (180) degrees; extension to forty-five (45) degrees; abduction to one hundred fifty (150) degrees; and external rotation to sixty (60) degrees. (*Id.* at 226). Plaintiff weighed two hundred twenty (220) pounds, and Dr. Korman described her as "obese." (*Id.* at 225).

On June 29, 2010, Plaintiff returned to Eastern Island for an appointment with Dr. Korman, and reported she had been seeking "less exertional" work for the past few months, and that her pain management benefits were expiring. (*Id.* at 218). Dr. Korman again noted that he "encouraged [Plaintiff] to seek non-exertional type work." (*Id.*). Plaintiff's lumbar ranges of motion were the same as they were during Plaintiff's previous visit to Eastern Island on April 22, 2010. (*Compare id.* at 220 and 226). Ranges of motion in her neck were: flexion to fifty (50) degrees; extension to forty (40) degrees; left and right rotation to eighty (80) degrees; and left and right lateral flexion to ten (10) degrees. (*Id.* at 220). Ranges of motion in her left shoulder were: flexion to one hundred fifty (150) degrees; extension to forty (40) degrees; abduction to one hundred forty-five (145) degrees; and external rotation to sixty (60) degrees. (*Id.*). Plaintiff weighed two hundred and twenty (220) pounds, and Dr. Korman described her as "obese." (*Id.* at 219).

August 31, 2010 progress notes from Eastern Island indicate that Plaintiff was unable to find work, that she was having difficulty with household chores, but that she was swimming and walking for thirty (30) to forty-five (45) minutes per day. (*Id.* at 212). Plaintiff reported moderate to severe pain in her neck, lower back, and buttocks, and moderate pain in her mid-back. (*Id.*). She weighed two hundred seventeen (217) pounds. (*Id.* at 213). Lumbar ranges of motion were as follows: flexion to ninety (90) degrees; extension to fifteen (15) degrees; left

lateral bending to twenty (20) degrees; and right lateral bending to twenty-five (25) degrees. (*Id.* at 214). Ranges of motion in Plaintiff's neck were: flexion to forty-five (45) degrees; extension to fifteen (15) degrees; right rotation to sixty-five (65) degrees; left rotation to seventy (70) degrees; right lateral flexion to ten (10) degrees; and left lateral flexion to fifteen (15) degrees. (*Id.*). Plaintiff's left shoulder ranges of motion were: flexion to one hundred fifty (150) degrees; extension to forty-five (45) degrees; abduction to one hundred ten (110) degrees; and external rotation to twenty (20) degrees. (*Id.*).

On October 11, 2011, Plaintiff returned to Eastern Island for a visit with Dr. Korman and complained of pain-related insomnia. (*Id.* at 206). She reported moderate deficits in her ability to do household chores, such as sweeping, vacuuming, laundry, walking more than four (4) city blocks, lifting more than five (5) or ten (10) pounds, climbing stairs, and walking on uneven surfaces. (*Id.*). She rated her neck pain as seven (7) to nine (9) on a scale of one (1) to ten (10), her trapezius pain as seven (7), her shoulder and mid-back pain as eight (8), and her lower back and buttock pain as "severe." (*Id.*). Plaintiff's neck ranges of motion were: flexion to forty (40) degrees; extension to forty (40) degrees; right rotation to sixty (60) degrees; left rotation to sixty (60) degrees; and right and left lateral flexion to fifteen (15) degrees. (*Id.* at 208). Ranges of motion in Plaintiff's left shoulder were: flexion to one hundred forty-five (145) degrees, backward extension to forty-five (45) degrees; abduction to ninety-five (95) degrees; and external rotation to fifty (50) degrees. (*Id.*). Plaintiff's thoracic / upper trunk ranges of motion were: flexion to sixty (60) degrees (normal); and right and left rotation to twenty (20) degrees (normal is thirty (30)). (*Id.*). Plaintiff's lumbar ranges of motion were: flexion to ninety (90) degrees; unable to perform extension; and left and right lateral bending to ten (10) degrees. (*Id.*).

Plaintiff received trigger point injections for muscle spasms in her lumbar region on November 24, 2009, December 15, 2009, January 5, 2010, January 12, 2010, January 19, 2010, and May 12, 2010, and May 19, 2010. (*Id.* at 298–304).

On January 12, 2012, Dr. Korman completed a medical assessment of Plaintiff's ability to do work-related activities, in which he concluded that she could: (i) occasionally lift five (5) to ten (10) pounds; (ii) walk for four (4) city blocks or for thirty (30) to forty-five (45) minutes at a stretch, or for one (1) to two (2) hours in an eight (8)-hour workday; (iii) sit for ten (10) to forty-five (45) minutes at a time, or two (2) hours in an eight (8)-hour workday; and (iv) occasionally stoop, balance, or crouch. (*Id.* at 326–27). Dr. Korman concluded that Plaintiff could not reach, handle, push, or pull due to weakness in her upper extremities, and noted several environmental restrictions, including heights, extreme temperatures, vibrations, moving machinery, and humidity. (*Id.* at 327-28).

On April 11, 2012, upon the referral of the Division of Disability Determination, Dr. Andrea Pollack evaluated Plaintiff. (*Id.* at 305-09). Dr. Pollack noted that Plaintiff had been medicated for high blood pressure since 2003, for which she had been hospitalized. (*Id.* at 305). Plaintiff reported that she began smoking cigarettes in 1996 and stopped in 2008. (*Id.* at 306). Plaintiff had had polycystic ovarian syndrome since 2001, which caused irregular menses and excess hair growth, and for which she underwent annual sonograms and took medications. (*Id.* at 305). She had asthma and chronic bronchitis, and she used a nebulizer and inhaler. (*Id.*).

Dr. Pollack took note of Plaintiff's back pain from her 1994 spinal fracture, and her 2009 car accident, which caused Plaintiff to experience a "constant, sharp, pins and needles-like [pain that] radiates bilaterally into her legs and left arm," and which Plaintiff rated as a nine (9) out of

ten (10) on the pain scale.  (*Id.* at 305).  She had bulging discs, and received acupuncture, injections, physical therapy, and chiropractic care, but had not had surgery.  (*Id.*).  Plaintiff took Lisinopril, Atenolol, Metformin, Prilosec, Flexeril, Vicodin, Ventolin, and Albuterol.  (*Id.* at 305–06).

During her consultation with Dr. Pollack, Plaintiff reported that she could do light housework and light cooking, that she could shower and dress herself, and that she watched television and socialized with friends.  (*Id.* at 306).  Dr. Pollack observed that Plaintiff did not appear to be in acute distress, her gait was normal, she could walk on her heels and toes without difficulty, she could squat halfway, she stood normally, she did not need assistance changing for the exam or getting on or off the exam table, and she could rise from her chair without difficulty.  (*Id.*).

Dr. Pollack further reported that Plaintiff's neck was supple, had no masses, and had no jugular vein distension, bruits, or thyromegaly.  (*Id.* at 307).  Plaintiff's blood pressure was one hundred twenty-six (126) over eighty (80), her pulse was seventy-four (74) beats per minute, her heart rhythm was normal, and she weighed two hundred thirty-two (232) pounds.  (*Id.* at 306–07).  Plaintiff's cervical flexion, extension, and lateral flexion were each to thirty (30) degrees. (*Id.* at 307).  Her lumbosacral flexion was to fifty (50) degrees; lateral flexion and lumbosacral rotation were each to fifteen (15) degrees; supine straight leg raise test was positive to fifty (50) degrees; forward elevation was to one hundred twenty (120) degrees; rotation was to sixty (60) degrees; and lumbosacral X-rays were negative.  (*Id.* at 307, 310).  She had no scoliosis, kyphosis, or abnormality in her thoracic spine.  (*Id*. at 307).

Dr. Pollack's evaluation revealed that Plaintiff had full range of motion in her elbows, forearms, wrists, and ankles, and that her joints were "stable, with no tenderness, redness, swelling, or effusion." (*Id.*). Her strength was five (5) out of five (5) in her upper and lower extremities with no sensory deficits. (*Id.*). A ventilation test revealed "mild obstruction and low vital capacity" in Plaintiff's breathing, which, according to Dr. Pollack, was "possibly due to restriction of lung volume." (*Id.* at 308). Dr. Pollack diagnosed: hypertension; polycystic ovarian syndrome; chronic bronchitis; asthma; and back pain. (*Id.*). According to Dr. Pollack, Plaintiff's prognosis was "stable." (*Id.*). Dr. Pollack concluded: "On the basis of my evaluation, she has moderate restrictions in squatting, bending, lifting, carrying, pushing, pulling, reaching, kneeling, walking, climbing stairs, and standing. She should avoid smoke, dust, known respiratory irritants, and activities which require heavy exertion." (*Id.*).

On January 10, 2013, Dr. Korman again evaluated Plaintiff. (*Id.* at 330). Dr. Korman found that Plaintiff had "profound whole spine int[ernal] derangements and symptomology," resulting in diminished physical capabilities as compared with Plaintiff's previous evaluations. (*Id.* at 331-35). Plaintiff's lumbar ranges of motion were: flexion to forty (40) degrees; unable to perform extension; and left and right lateral bending to ten (10) degrees. (*Id.* at 333). Plaintiff's left shoulder ranges of motion were: flexion to one hundred (100) degrees; extension to forty (40) degrees; abduction to ninety (90) degrees; and external rotation to forty (40) degrees. (*Id.*). Plaintiff's thoracic / upper trunk ranges of motion were: flexion to forty (40) degrees; right rotation to fifteen (15) degrees; and left rotation to ten (10) degrees. (*Id.*). Ranges of motion in Plaintiff's neck were: flexion to twenty (20) degrees; extension to fifteen (15) degrees; right rotation to forty-five (45) degrees; and right and left lateral flexion to ten (10) degrees. (*Id.*). Dr.

Korman opined that Plaintiff was totally disabled at that time, "with disabilities permanent in nature," and that she was "unable to engage in gainful employment with sedentary work." (*Id*. at 330).

### D. The ALJ's Decision

The ALJ employed the five (5)-step sequential analysis set forth in 20 C.F.R. § 404.1520, found that Plaintiff was "not disabled" within the meaning of the Social Security Act, and denied her request for disability benefits. (*Id.* at 11–17). She found that Plaintiff met the insured status requirements, that she had not engaged in substantial gainful activity since the onset date, and that she had degenerative disc disease in her lumbar spine, asthma, and obesity, which were severe impairments. (*Id.* at 13). Her hypertension and diabetes were not severe because they were "well-controlled with medication," had not required hospitalization, and did not affect her ability to work. (*Id.*). The ALJ found that none of Plaintiff's impairments met the severity of a Listing. (*Id.*).

Next, the ALJ found that Plaintiff had the RFC to: sit for six (6) hours and stand or walk for two (2) hours, with normal breaks in an eight (8)-hour workday, occasionally lift or carry ten (10) pounds, balance, stoop, kneel, crouch, push/pull, and occasionally climb ramps or stairs. (*Id*. at 14). The ALJ determined that Plaintiff could never climb ladders, ropes, or scaffolds, and that she must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*). In reaching this RFC finding, the ALJ credited: (i) Dr. Pollack's April 2012 report; (ii) the August 31, 2010 Eastern Island report stating that Plaintiff was unable to find work, but that she was able to do household chores and walk for thirty (30) to forty-five (45) minutes per day; (iii) the March 31, 2010 assessment stating that Plaintiff's upper extremity Final Whole Person

Impairment was only two percent (2%); (iv) the December 15, 2009 EMG/NCV study, "which was normal and failed to reveal evidence of radiculopathy in the muscles evaluated"; and (v) Plaintiff's "initial testimony (subsequently changed) regarding a broad range of daily activities." (*Id.*).

The ALJ found that the record did not support Plaintiff's claims of disability stemming from her subjective complaints of pain, citing the facts that: (i) she took care of her daughter full-time since birth while her husband worked; (ii) she received "minimal treatment for her conditions"; (iii) her only MRIs were from 2009, and showed only "moderate impairment"; and (iv) she enjoyed "relatively full activities of daily living." (*Id.* at 15). Plaintiff could do housework, run errands, cook for her family, and socialize with friends. (*Id.*). The ALJ found Plaintiff's assertion that she relied on her sister to help her three (3) to four (4) mornings per week for approximately three (3) hours each morning "represented a significant change in her testimony and was somewhat incredible." (*Id.*). The ALJ also assigned little weight to Dr. Korman's "extremely restrictive assessment" because it was "not commensurate with the treatment provided[,] the objective diagnostic testing performed[,] and the lack of any new testing in over [sic] 3 years." (*Id.*).

At step four (4), the ALJ found that Plaintiff could not perform her past relevant work as a homecare worker. (*Id.* at 15). At step five (5), upon consideration of Mr. Alberigi's (the vocational expert) testimony, and Plaintiff's age, education, work experience and RFC, the ALJ determined that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and that Plaintiff therefore was "not disabled." (*Id.* at 16).

## II.    DISCUSSION

### A.    Standards of Review

#### 1.    Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The standard applied to a Rule 12(c) motion is the same as that applied to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).  To survive such a motion, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009) (internal quotation marks omitted).  The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *Id.* at 679.  The court is limited "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

#### 2.    Review of Determinations by the Commissioner of Social Security

A court reviewing the final decision of the Commissioner may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)).  "[S]ubstantial

evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and citation omitted).  "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Id.* (internal quotation marks and citation omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review does not apply to the Commissioner's conclusions of law or application of legal standards.  *See Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).  Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence.  *See Pollard v. Halter*, 377 F.3d 183, 188–89 (2d Cir. 2004).  If a court finds that the Commissioner has failed to apply the correct legal standards, the court must determine if the "error of law *might* have affected the disposition of the case."  *Id.* at 189 (emphasis added).  If so, the Commissioner's decision must be reversed.  *Id.*; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary.  *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

### B.    Evaluation of Disability

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The regulations promulgated under the Social Security Act require the Commissioner to apply a five (5)-step sequential analysis to determine whether an individual is disabled under Title II of the Social Security Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b). "Substantial work activity … involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity … is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). If a claimant is doing "substantial gainful activity," the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). If the Commissioner does not determine that the claimant is disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the

claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id*.

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can adjust to other work, the claimant is not disabled. *Id*. If the claimant cannot adjust to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving the first four (4) steps of the sequential analysis, and the burden shifts to the Commissioner at the final step. *See Talavera*, 697 F.3d at 151.

### C. Application of the Five-Step Sequential Analysis

Plaintiff argues that the ALJ erred by: (1) unreasonably rejecting the restrictive January 12, 2012 medical opinion of her treating physician, Dr. Korman (*see* Pl's Br. (Dkt. 18) at 9–15); (2) rejecting her subjective complaints of pain (*see id*. at 16–18); and (3) failing to consider her obesity as factor affecting her RFC (*see id*. at 18–19). The Commissioner responds that the ALJ's finding that Plaintiff was not disabled is supported by substantial evidence, that she properly assessed her credibility regarding her symptoms, and that she considered plaintiff's obesity. (*See* Def's Br. (Dkt. 20) at 20–27).

### 1.    Treating Physician Rule

Plaintiff argues that the ALJ violated the "treating physician rule," under which "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)). "In order to override the opinion of the treating physician, . . . the ALJ must explicitly consider, *inter alia*: (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129)).

The ALJ considered these factors. She noted that Plaintiff saw Dr. Korman infrequently during the 2009 – 2011 period, once in January 2012, and once again in January 2013. (Tr. at 15). The ALJ also noted that the results of the 2009 MRI exams conflicted with Dr. Korman's January 12, 2012 assessment because they revealed only moderate impairment, which was the medical opinion of Dr. Fromm, a specialist, who recommended a conservative course of treatment, as did Dr. Korman. (*Id.* at 275–78). The ALJ, therefore, did not unreasonably depart from the "treating physician rule," but instead weighed Dr. Korman's opinion according to the factors set forth in *Burgess*, 537 F.3d at 129, 20 C.F.R. §§ 404.1527(c) and 416.927(c).

### 2.    Plaintiff's Subjective Complaints of Pain

Plaintiff also contends that the ALJ unreasonably rejected her subjective complaints of pain in determining her RFC, and failed to give a "good reason" for doing so. (*See* Pl.'s Br. at 6–

18).  In "determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted).  The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979); *see also Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility than the Commissioner).  "Because it is the function of the agency, not reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant, we will defer to its determinations as long as they are supported by substantial evidence."  *Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) (summary order) (internal citations omitted).

The Second Circuit has "repeatedly held that a claimant's testimony concerning his pain and suffering is not only probative on the issue of disability, but 'may serve as the basis for establishing disability, even when such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence.'"  *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)).  Thus, where there is a "medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms, such as pain," the ALJ "must then evaluate the intensity and persistence" of the symptoms to determine how the symptoms limit a claimant's capacity for work.  20 C.F.R. § 404.1529(c)(1).  "Further, because a claimant's symptoms, such as pain, 'sometimes suggest a

greater severity of impairment than can be shown by objective medical evidence alone,' once a claimant has been found to have a pain-producing impairment, the Commissioner may not reject the claimant's statements about his pain solely because objective medical evidence does not substantiate those statements." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 349–50 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1529(c)(2)-(3)).

In assessing a claimant's allegations concerning the severity of his symptoms, an ALJ must engage in a two-step analysis. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). Second, [i]f the claimant does suffer from such an impairment . . . the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.*

If the claimant's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in assessing that testimony, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *Meadors v. Astrue,* 370 Fed. Appx. 179, 183 n.1 (2d Cir. 2010) (citing 20 C.F.R. 404.1529(c)(3)). An ALJ who finds that a claimant is not credible must do so

"explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Rivera v. Astrue*, No. 10-civ-4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012) (quoting *Taub v. Astrue,* No. 10-civ-2526, 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011).

The ALJ properly followed this two-step process, and found that, based upon substantial evidence, Plaintiff has the RFC to perform sedentary work, notwithstanding her subjective complaints of pain. The ALJ relied on the 2009 MRI tests, which showed only "moderate impairment," and the fact that Plaintiff was prescribed only conservative treatment. (Tr. at 15); *see* 20 C.F.R. § 404.1529(c)(2) (providing that ALJ will consider "objective medical evidence" in assessing claimant's subjective complaints of pain); 20 C.F.R. § 404.1529(c)(3)(iii) (providing that ALJ may consider treatment required for condition to determine severity). The ALJ also properly cited the fact that Plaintiff was able to take care of herself and her husband, act as primary caregiver to her young daughter, perform household chores, and run errands. (Tr. at 15); *see* 20 C.F.R. § 404.1529(c)(3)(i). The ALJ assessed Plaintiff's credibility in light of the factors set forth in 20 C.F.R. § 404.1529(c), and her RFC finding was supported by substantial evidence.

### 3.    Plaintiff's Obesity

Plaintiff contends that the ALJ erred by failing to consider the effect of her obesity on her other impairments. (*See* Pl's Br. at 18–19).

> However, "obesity is not in and of itself a disability," and "an ALJ's failure to explicitly address a claimant's obesity does not warrant remand." *Guadalupe v. Barnhart*, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citations omitted). "[W]here the record contains evidence indicating limitation of function due to obesity, the ALJ must consider the effect of obesity on the claimant's ability

to do basic work activities at steps two through four of the sequential evaluation process." *Battle v. Colvin*, 2014 WL 5089502, at *5 (W.D.N.Y. Oct. 9, 2014) (citation omitted). "'Conversely, the ALJ's obligation to discuss a claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to the claimant's ability to perform work related activities.'" *Id.* (quoting *Farnham v. Astrue*, 832 F.Supp.2d 243, 261 (W.D.N.Y.2011)) (citing cases); *accord Cahill v. Colvin*, 2014 WL 7392895, at *27 (S.D.N.Y. Dec. 29, 2014).

*Browne v. Comm'r of Soc. Sec.*, No. 14 CIV. 1952 GWG, 2015 WL 5449911, at *11 (S.D.N.Y. Sept. 16, 2015). While Dr. Korman variously stated that Plaintiff was "obese" or "morbidly obese," he did not indicate any specific limitations resulting from her obesity. (Tr. at 231, 237, 242). Nothing in the record suggests that Plaintiff's obesity affected her ability to perform sedentary work. *See Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) ("[M]edical reports referencing [claimant's] weight failed to identify limitations therefrom, and … no limitations sufficient to preclude light work were identified upon physical examination of [claimant's] overall condition.").

### III.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings

under Rule 12(c) of the Federal Rules of Civil Procedure is granted, and Plaintiff's motion for

judgment on the pleadings under Rule 12(c) is denied.  The Clerk is directed to close this case.

**SO ORDERED.**


_s/ Sandra J. Feuerstein_
Sandra J. Feuerstein
United States District Judge


Dated:  March 24, 2016
      Central Islip, New York